# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| GARY GROVER, et al., | ) | CASE NO. 1:19-cv-12 |
| | ) | |
| | ) | |
| PLAINTIFFS, | ) | JUDGE SARA LIOI |
| | ) | |
| vs. | ) | MEMORANDUM OPINION |
| | ) | AND ORDER REGARDING THE |
| BMW OF NORTH AMERICA, LLC, | ) | TESTIMONY AND OPINION OF |
| | ) | PLAINTIFFS' EXPERT |
| | ) | [Resolving Doc. Nos. 67 and 69] |
| DEFENDANT. | ) | |

This matter is before the Court on the motion of defendant BMW of North America, LLC ("BMW") to exclude the testimony and opinion of plaintiffs'[1] expert, Darren Manzari. (Doc. No. 69.)[2] Plaintiffs opposed BMW's motion (Doc. No. 78), and BMW filed a reply (Doc. No. 94).

For the reasons that follow, BMW's motion to exclude is granted in part and denied in part.

## Background

All plaintiffs in this action purchased different models and model years of BMW vehicles from different sellers. But the basic facts underlying each plaintiffs' claims have a common core, and those common factual allegations and claims may be summarized as follows.

---

[1] There are seven (7) plaintiffs in this action: Gary Grover ("Grover"), Reginald Williams ("Williams"), Dana Walling ("Walling"), Joshua Cribbs ("Cribbs"), Wendy Massey ("Massey"), John Webb ("Webb"), and Parker Jarvis ("Jarvis") (collectively "plaintiffs"). The Court notes that the plaintiff identified in the amended complaint (Doc. No. 13) as Ava Littlejohn was dismissed from this action by the agreement of counsel for both sides. (*See Grover v. BMW of N. Am., LLC*, 434 F. Supp. 3d 617, 621 n.1 (N.D. Ohio 2020).

[2] The parties' briefing contains confidential information pursuant to the protective order in this case, and their filings regarding BMW's motion to exclude consist of both public redacted documents and sealed unredacted documents. The document numbers herein refer to the sealed briefing documents.

All plaintiffs' vehicles are equipped with a N63 turbocharged engine, and they all claim that their vehicles consumed excessive amounts of engine oil.  (*See* Doc. No. 13 ¶¶ 88–90.) Plaintiffs were told that the excessive oil consumption of their vehicles was normal. (*See id.* ¶¶ 14, 22, 30, 41, 49, 57, 67.) But plaintiffs allege that the excessive oil consumption was caused by a manufacturing defect in their N63 engines (*id.* ¶ 85) which was not remedied under warranty by BMW. This allegation serves as the basis for their four causes of action for breach of warranty and other claims under federal and state law. Further details regarding the factual background of this case are contained in the Court's memorandum opinion and order ruling on BMW's motion to dismiss, *Grover v. BMW of North Am, LLC*, 434 F. Supp. 3d 617, 620–22 (N.D. Ohio 2020), and in the Court's contemporaneously filed memorandum opinion and order ruling on the parties' cross motions for summary judgment, and the Court assumes familiarity therewith.

Darren Manzari ("Manzari") is plaintiffs' retained expert in this action. BMW's motion seeks to exclude certain opinions rendered by Manzari.

### Standard of Review

BMW's motion to exclude Manzari's expert opinions is governed by Rule 702 of the Federal Rules of Evidence:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

The Sixth Circuit Court of Appeals has explained:

> Rule 702, in concert with other Rules of Evidence, empowers the district court to ensure that the expert's testimony is both relevant and reliable. *See Daubert v. Merrell Dow Pharms.,* 509 U.S. 579, 589, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993). The court plays this same gatekeeping function even if the expert's opinion

is "technical," rather than scientific, in nature. *See Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, 141, 119 S. Ct. 1167, 143 L. Ed. 2d 238 (1999). This line of cases governing the district court's screening of experts seeks to "strike a balance between a liberal admissibility standard for relevant evidence on the one hand and the need to exclude misleading 'junk science' on the other." *Best v. Lowe's Home Ctrs., Inc.,* 563 F.3d 171, 176–77 (6th Cir. 2009).

*Ask Chems., LP v. Computer Packages, Inc.,* 593 F. App'x 506, 509 (6th Cir. 2014).

There is no "definitive checklist or test" to strike this balance, but relevant factors include: (1) whether a theory or technique "can be (and has been) tested;" (2) whether a "theory or technique has been subjected to peer review and publication;" (3) the "known or potential rate of error;" and (4) whether the theory or technique is generally accepted. *See Daubert,* 509 U.S. at 590–94 (citations omitted). These factors are not exhaustive, however, and the inquiry is "a flexible one[.]" *Pluck v. BP Oil Pipeline Co*., 640 F.3d 671, 677 (6th Cir. 2011) (citations omitted).

The Court's "gatekeeping inquiry must be 'tied to the facts of a particular case.'" *Kumho*, 526 U.S. at 150 (quoting *Daubert*, 509 U.S. at 591) (internal quotation marks omitted). But the Court is not "required to admit expert testimony 'that is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered.'" *Nelson v. Tenn. Gas Pipeline Co*., 243 F.3d 244, 254 (6th Cir. 2001) (quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146, 118 S. Ct. 512, 139 L. Ed. 2d 508 (1997)).

That said, the Sixth Circuit has explained "that 'rejection of expert testimony is the exception, rather than the rule.'" *Burgett v. Troy–Bilt LLC,* 579 F. App'x 372, 376 (6th Cir. 2014) (citation omitted). In general, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert,* 509 U.S. at 596 (citation omitted).

3

A "'witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion' if the expert's technical or 'other specialized knowledge' will help the jury understand the evidence or determine a fact in issue." *In re Ford Motor Co. Spark Plug & 3-Valve Engine Prods. Liab. Litig.*, 98 F. Supp. 3d 919, 925 (N.D. Ohio 2014) (quoting Fed. R. Evid. 702(a)); *see also In re Polyurethane Foam Antitrust Litig.*, No. 1:10-md-2196, 2015 WL 12748012, at *1 (N.D. Ohio July 16, 2015) ("Expert opinion testimony involves application of 'scientific, technical, or other specialized knowledge [that] will help the trier of fact to understand the evidence or to determine a fact in issue.'") (quoting Fed. R. Evid. 702(a)).

But "[i]t is well established that an expert witness's testimony is not helpful 'where the jury has no need for an opinion because it easily can be derived from common sense, common experience, the jury's own perceptions, or simple logic.'" *Jones v. Pramstaller*, 874 F. Supp. 2d 713, 720 (W.D. Mich. 2012) (quoting Charles Alan Wright et al., 29 *Federal Practice & Procedure Evidence* § 6264); *see also In re Polyurethane Foam Antitrust Litig.*, 2015 WL 12748012, at *1 ("The nub of this helpfulness requirement is to exclude testimony where the witness is no better suited than the jury to make the judgment at issue, providing assurance against the admission of opinions which would merely tell the jury what result to reach.") (quoting *United States v. Diaz-Arias*, 717 F.3d 1, 12 (1st Cir. 2013) (internal quotation marks omitted)). Expert testimony that is not helpful to the jury "creates the danger that a jury may unnecessarily defer to the judgment of a highly credentialed expert, when in fact the law considers lay jurors just as capable as [the expert] to decide whether evidence establishes some fact." *Id.* (citing *Rosenfeld v. Oceania Cruises, Inc.*, 682 F.3d 1320, 1340 (11th Cir. 2012) ("when jurors need no assistance to understand the fact at

issue, the expert's testimony [on the same facts] may lend undue credence to one party's view of the facts because that testimony bears the imprimatur of an expert")).

It is plaintiffs' burden to establish that Manzari's opinions in this case are admissible under the applicable standard. *Nelson*, 243 F.3d at 251 ("It is the proponent of the testimony that must establish its admissibility by a preponderance of proof.") (citing *Daubert*, 509 U.S. at 592 n.10).

**BMW's Motion to Exclude**

BMW moves to exclude certain opinions of Manzari. As described in BMW's motion, Manzari issued reports on November 12, 2020 and January 11, 2021, together defined as the "First Manzari Report" or "First Report." (Doc. No. 69 at 1[3] (citing Doc. No. 69-3).) The First Manzari Report contains five (5) opinions and conclusions: (1) defective valve stem seals caused excessive oil consumption in N63 engines (Doc. No. 69-3 ¶¶ 37–42); (2) BMW concealed this defect from consumers (*id.* ¶¶ 43–56); (3) plaintiffs' vehicles suffered from this defect which BMW did not remedy or resolve in a reasonable time (*id.* ¶¶ 57–113); (4)[4] plaintiffs' vehicles were not fit for their ordinary purpose of providing safe and reliable transportation (*id.* ¶ 114); and (5) the defective valve stem seals reduced the value of plaintiffs' vehicles and prudent repair requires replacement of the engines at a cost of $12,500–15,000 each (*id.* ¶¶ 115–117).

On September 1, 2021, Manzari supplemented the First Report, which BMW defines as the "Second Manzari Report" or "Second Report." (Doc. No. 69 at 2 (citing Doc. No. 69-4).) In the Second Report, Manzari considers additional information in the form of the testimony of BMW's technical service engineers, Erik Luchsinger ("Luchsinger") and Richard Veren ("Veren"). (*See* Doc. No. 69-4.) It appears that the purpose of the Second Report is to supplement

---

[3] All page number references are to the consecutive page numbers assigned to each individual document by the Court's electronic filing system, a citation practice recently adopted by the Court despite different directions in the Initial Standing Order in this case.

[4] The First Manzari Report contains a numbering error which lists two opinions as "Opinion 3."

the information Manzari considered in the First Report, but he offers no new opinions in the Second Report.

BMW moves to exclude certain aspects of Manzari's opinions on the grounds that he is not competent to render opinions regarding the N63 engine and its alleged defects, and those opinions are not reliable under the test established by *Daubert* because they are not the product of any reliable or generally accepted principles or methodologies.

The Court will first consider BMW's motion to exclude Manzari's opinion that BMW concealed the N63 engine's alleged valve stem defects from consumers, and then it will address BMW's motion to exclude certain aspects of Manzari's opinions concerning the merits of plaintiffs' claims.

**A. Manzari's concealment opinion**

Manzari opines that BMW concealed its knowledge of the N63 engine's alleged valve stem defect from plaintiffs. (*See* Doc. No. 69-3 ¶¶ 43–56.) BMW argues that this is not an expert opinion but simply a comment on the evidence and conclusion of law that is improper under the Federal Rules of Evidence and *Daubert*. (Doc. No. 69 at 2–3.)

In the First Report, Manzari chronicles a lengthy series of BMW measures and service bulletins concerning oil consumption issues in vehicles with N36 engines, and the deposition of BMW's representative, Michael Murray, concerning these publications. He prefaces his summary of these publications by stating:

> Over the course of approximately 2 years, BMW has changed its position from diagnosing and repairing manufacturing defects that cause excessive oil consumption to changing its position on what constitutes excessive oil consumption, all in an effort to avoid paying for costly repairs when replacing defective valve stem seals is involved.

(Doc. No. 69-3 ¶ 43.)

From this information, Manzari concludes:

the delay from diagnosis to dissemination of information was due to BMW working with an aftermarket tool supplier to develop a tool that would reduce the time needed to replace the valve seals. I believe this delay of more than two years was a completely unacceptable decision on the part of BMW as BMW did not need to develop a new tool to replace valve stem seals. BMW dealers were fully capable at that time of replacing valve stem seals with existing tools.

(*Id.* ¶ 55.)

Manzari then opines that despite knowing as early as February 2013 that defective valves stem seals caused excessive consumption of engine oil, BMW "concealed this knowledge from plaintiffs and other customers" by, among other things, instructing dealers to advise customers that excessive oil consumption was normal, overfilling engine oil, and "discouraging its dealers from providing a customer with a record of an oil consumption complaint as evident from Service Information Bulletin 01 16 15." (*See id.* ¶ 56.)

In the Second Report, Manzari reviews excerpts from the testimony of Veren who testified that BMW knew as early as 2012 or 2013 that excessive oil consumption in vehicles with the N63 engines was not normal and could be resulting from prematurely worn valve stem seals which were becoming hard and letting oil into the combustion chamber, but could not identify a document in which BMW disclosed to N63 car owners that excessive oil consumption in their vehicles could be caused by defective valve stem seals. (Doc. No. 69-4 ¶¶ 4–10.)

After reviewing Veren's testimony, Manzari states in the Second Report:

I *understand Mr. Veren testified* that [BMW, its engineering teams, and dealers] knew as early as in 2012 that valve stem seals in N63 engines were going bad … and that BMW did not put out any documentation to consumers to inform them that oil consumption problems in their cars could be a result of defective valve stem seals.

Thus, *what I gather from this testimony* is that BMW knew about the valve stem seals defect and how it leads to burning of the oil, and consumption of oil that is not normal. However, [BMW brochures and service bulletin 11 03 13 state it is

> normal for N63 engines to consume up to 1 quart of engine oil per 750 miles.]
> Therefor the brochure and SIB 11 03 13 are technically inaccurate and misleading.

(*Id*. ¶¶ 11–12 (emphasis added).)

BMW argues that Manzari's opinion that BMW concealed knowledge of a valve stem defect in the N63 engine from consumers is speculative and an improper expert opinion and conclusion of law, citing *Carroll v. BMW of N. Am., LLC*, No. 1:19-cv-224, 2021 WL 3474032 (S.D. Ind. Aug. 6, 2021), where the court granted BMW's motion to exclude Manzari's opinion that BMW fraudulently concealed from customers its knowledge of defective valve stem seals in N63 engines. (Doc. No. 69-1 at 9–13 (citing *Carroll*, 2021 WL 3474032, at *15–16).)

In opposition, plaintiffs argue that under Fed. R. Evid. 702(a), Manzari may use his scientific, technical, or other specialized knowledge to help the trier of fact understand whether BMW concealed from consumers that the N63 engine suffered from defective valve stem seals from consumers. (Doc. No. 78 at 15–19.) In support, plaintiffs cite two cases where the courts denied BMW's motion to exclude Manzari's opinion on concealment finding that issue is a question of fact upon which Manzari may properly opine. *Id*. at 15 (citing *Mize v. BMW of N. Am.*, *LLC*,2:19-cv-7, 2021 WL 5571165, at *7 (N.D. Texas Oct. 1, 2021); *Harris v. BMW of N. Am.*, *LLC*, 4:19-cv-16, 2020 WL 7318087, at *4 (E.D. Texas Dec. 11, 2020).)

The Court agrees with BMW that Manzari's opinions that BMW misled consumers and concealed its knowledge of alleged valve stem defects is an improper opinion that should be excluded. First, to the extent that Manzari is rendering an opinion that BMW fraudulently concealed its knowledge of an alleged valve stem defect in N63 engines, fraudulent concealment is a legal conclusion upon which an expert may not properly opine. *See Ross Bros. Const. Co., Inc. v. Markwest Hydrocarbon, Inc.*, 196 F. App'x 412, 415 (6th Cir. 2006) (finding that district court properly excluded opinion that defendant's tender of partial payment "was not made in good faith"

as that opinion was not a factual conclusion within the expert's competence, but an improper legal conclusion) (citing *Stoler v. Penn Cent. Transp. Co.,* 583 F.2d 896, 899 (6th Cir. 1978) (the district court did not abuse its discretion to exclude plaintiff's expert from giving testimony that would have amounted to a legal opinion as to what constituted "extra hazardous" crossing under Ohio law)); *Torres v. Cnty. of Oakland,* 758 F.2d 147, 150 (6th Cir. 1985) ("The problem with testimony containing a legal conclusion is in conveying the witness' unexpressed, and perhaps erroneous, legal standards to the jury. This invades the province of the court to determine the applicable law and to instruct the jury as to that law.") (internal quotation marks omitted).

To the extent that Manzari is opining upon a question of fact relevant to the issue of fraudulent concealment, his opinion is also improper. The Court has examined the basis for Manzari's opinions that BMW concealed from consumers their knowledge of a valve stem defect and concludes that this opinion is not based upon his technical or specialized knowledge, but rather based upon his own conclusions and gloss on certain facts regarding what BMW knew and when it knew it.

For example, with respect to Veren's testimony, Manzari states that he "understands" and "gathers" from that testimony BMW knew of the N63 valve stem seal issues as early as 2012 but did not tell consumers that their oil consumption problems may be caused by defective valve stem seals. (*See* Doc. No. 69-4 at 8.) As an initial matter, Manzari applies no apparent technical knowledge or methodology to his analysis of Veren's testimony to reach the conclusion as to when BMW knew of the alleged engine valve seal. Given that Veren testified directly on these matters, it is well within the ken of the factfinder to come to a conclusion themselves by reading the transcript or listening to Veren's testimony without the need for technical or specialized knowledge. *See e.g. Estate of Collins v. Wilburn*, 253 F. Supp. 3d 989, 992 (E.D. Ky. 2017) ("[A]n

expert, regardless of his credentials, is no more able than a jury to view and interpret [a] video. In fact, [the expert's interpretation] may only confuse the jury or, at worst, mislead them with his characterizations of what is on the film … [and] may supplant the jury's exercise of common sense.") (citing cases).

The factfinder is similarly capable of reading a BMW document and determining whether the contents reflect an effort by BMW to mislead or conceal N36 engine problems with valve stem seals. One of the bases for Manzari's concealment opinion is that BMW "discourage[ed] its dealers from providing a customer with a record of an oil consumption complaint as evident from Service Information Bulletin 01 16 15."[5] This is another example that Manzari's opinion concerning alleged concealment is not a product of technical knowledge and expertise, but rather a product of his own gloss on the contents of a service bulletin which the jury may read for itself and reach its own conclusions based upon their common sense and experience. The actual language from SIB 01 16 15 in July 2015 provides as follows:

**Expedited Engine Oil Top-up Service Procedure**

To speed up this process, there will be no need to open up a Repair Order and get the customer's signature at the time the top-up is being performed.

**Normal Claim Submission:**

After performing the top-up, create and open an RO on the specific VIN to upload and create a claim for reimbursement (customer's signature not required).

(Doc. No. 77-24 at 20.)

In November 2015, SIB 01 16 15 was amended and provides as follows:

**Expedited Engine Oil Top-up Service Procedure**

To speed up this process, there will be **no need** to open up a Repair Order and get the customer's signature "at the time" the top-up is being performed.

---

[5] *See* Doc. No. 69-3 at 21 ¶ 56(5).

> To help with claim submissions, when claiming for these reimbursements, maintain a VIN list of the engine oil top-ups performed that contains at least the following information:
>
> …
>
> **The above process is not mandatory, the process is only being provided to help your center expedite the oil top up process when the customer is at your center.**

(*Id*. at 22 (emphasis in original).)

From these documents, Manzari concludes that BMW discouraged dealers from creating records of oil consumption complaints. But as previously indicated, this interpretation of the SIB is not informed by Manzari's technical knowledge or expertise; rather, it is based upon his own say-so unconnected from technical analysis or how he applied any such analysis to arrive at his opinion regarding concealment. *Joiner*, 522 U.S. at 146 ("[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert."). Manzari's opinion and testimony concerning concealment is not helpful to the factfinder in this case, and simply represents his own "expert gloss" on information from which the factfinder is capable of drawing their own conclusions without the need for technical assistance. *Carroll*, 2021 WL 3474032, at *15 (quoting *United States v. Christian*, 673 F.3d 702, 710 (7th Cir. 2012)); *Jarvela v. Washtenaw Cnty.*, No. 19-cv-12157, 2021 WL 3286673, at *19 (E.D. Mich. Aug. 2, 2021) (expert testimony regarding observations of what video shows is not permissible as it does not assist the trier of fact because observing the video and ascertaining what it shows is within the common experience of the average citizen) (citations omitted).

BMW's motion to exclude Manzari's testimony and opinion that BMW concealed alleged engine valve stem defects from plaintiffs is granted.

**B.  Manzari's opinions regarding the merits of plaintiffs' claims**

BMW generally argues that Manzari's opinions regarding the merits of plaintiffs' claims fail to meet the reliability and relevancy requirements of Rule 702, lack sufficient factual underpinnings, and are based upon speculation and unfounded inferences. In opposing BMW's motion, plaintiffs point to Manzari's extensive experience and qualifications, which are detailed in the First Report. In summary, Manzari is an expert mechanic with thirty-five years of experience in the automotive industry, an AAS decree in automotive engineering, and certified as a Master Automotive Technician by the National Institute of Service Excellence (along with other numerous certifications). He has owned and operated three large volume automotive and diagnostic repair facilities and worked as a consultant for colleges and numerous automotive entities and manufacturers, including BMW and the N63 engine at issue here. (*See* Doc. No. 78 at 5–6; Doc. No. 78-3; Doc. No. 69-3 at 3–4 and ¶ 19.) Plaintiffs generally argue in opposition to BMW's motion that Manzari's opinions are based upon his knowledge of internal combustion engines and expertise in the analysis and diagnosis of customer automotive complaints and vehicle performance, review of numerous BMW reports, measures, service bulletins, guidance to dealers, and other documents concerning the N63 engine and oil consumption issues, the testimony of BMW's experts related thereto, and service and warranty records of the vehicles which are the subject of the instant action. (*See* Doc. No. 78 at 7 (citing Doc. No. 69-3 ¶¶ 14–39).)

In considering the parties' respective arguments, the Court has examined Manzari's credentials and the substance of the First and Second Reports and the methodology he employed to arrive at his opinions. The First Report identifies all of the documents and information (in excess of 50) to which Manzari applied his knowledge and experience and relied upon in forming his opinions. (*See* Doc. No. 69-3 ¶¶ 13–15.) Utilizing those documents and applying his experience

and familiarity with the N63 engine, Manzari summarized the excessive oil consumption complaints BMW received regarding the N63 engine, BMW's understanding of the complaints, and BMW's responses, reports, measures, and service bulletins issued in connection therewith over time. (*See* Doc. No. 69-3 ¶¶ 16–36.)

Although somewhat conclusory, Manzari's application of his knowledge and experience to his examination of documents produced by BMW regarding N63 oil consumption issues, as well as documentation concerning the specific facts concerning the subject vehicles in this case, utilizes a reliable methodology sufficient to satisfy the Court's gatekeeping function. *See Harris*, 2020 WL 7318087 (finding Manzari's application of his knowledge and experience to review of extensive documentation to be a reliable methodology and denying BMW's motion to exclude Manzari's opinions on the merits of plaintiffs' claims); *see also In re Boston Scientific Corp. Pelvic Repair Sys. Prods. Liab. Litig.*, MDL No. 2326, 2018 WL 2440235, at *2 (S.D. W. Va. May 30, 2018) (doctor's opinion relying upon defendant's internal documents, clinical experience, and review of scientific literature is based upon a reliable methodology).

Having determined that Manzari's application of his knowledge and experience to a review of an extensive list of relevant documents generally satisfies the requirement that an expert's opinion must be based upon a reliable methodology, the Court will separately address each of BMW's challenges to certain aspects of Manzari's opinions on the merits of plaintiffs' claims.[6]

### 1. Manzari's opinion that plaintiffs' vehicles suffer from defective valve stem seals is not reliable

BMW argues that Manzari's opinion that the valve stem seals in plaintiffs' vehicles were defective and caused their vehicles to consume too much oil is completely unsupported by the

---

[6] BMW's motion does not challenge each of Manzari's opinions in their entirety, nor track the sequence of Manzari's opinions in the First Report.

evidence because he did not inspect any of plaintiffs' vehicles but simply relied upon plaintiffs' testimony. (*See* Doc. No. 69-1 at 14–20.) In response, plaintiffs point to the numerous documents and information reviewed by Manzari to which he applied his knowledge and experience to arrive at his individual opinions regarding the engine oil consumption issues for each of plaintiffs' vehicles. (*See* Doc. No. 78 at 19–24.)

BMW's argument that Manzari's opinions are not reliable because he did not personally inspect each of plaintiffs' vehicles is unavailing. "Unlike an ordinary witness … an expert is permitted wide latitude to offer opinions, including those that are not based on firsthand knowledge or observation." *Daubert*, 509 U.S. at 592 (citations omitted).

The Court has examined the First Report wherein Manzari opined that each of plaintiffs' vehicles suffered from defective valve stem seals.  In addition to the extensive list of documents that Manzari lists at the outset of his report upon which he relied to reach his opinions,[7] he also separately lists the information, documentation, and observations that he relied upon to reach his opinion as to each of plaintiffs' vehicles. The documents specific to each plaintiff included the specifications for each vehicle, plaintiffs' individual oil consumption complaints to the dealer, actions taken by the dealer in response, photos and video recordings for each vehicle for which such evidence was available,[8] presence of smoke from the tailpipe,[9] sales history, service recommendations, warranty history, and dealer service records. (*See* Doc. No. 69-3 ¶¶ 57–113.) Applying his knowledge and experience to all of the documents and information he relied upon,

---

[7] Among the numerous documents produced by BMW regarding oil consumption issues with the N63 engine, including a report issued by BMW's representative Michael Murray entitled "N63 Oil Consumption—High Mileage—Valve seals Worn."

[8] Manzari viewed photographs and video recordings of the subject vehicles owned by Jarvis, Williams, and Walling. The photographic and video evidence for each showed oil inside the combustion chamber, fouled spark plugs, and smoke from the tailpipe. (*See* Doc. No. 69-3 ¶¶ 61, 70, 80.)

[9] The Court notes that BMW's own expert, Clark, testified that smoke can indicate defective valve stem seals. *See* Doc. No. 78-11 at 8.)

and those specific to each subject vehicle, Manzari concluded to a reasonable degree of technical certainty that the oil consumption issues experienced by plaintiffs were excessive and consistent with defective valve stem seals.

The Court concludes that the methodology Manzari employs in his opinion regarding plaintiffs' vehicles is sufficiently reliable to satisfy the Court's gatekeeping function. "To determine if expert testimony is reliable, a Court looks to whether the testimony is based on 'sufficient facts and data,' 'the product of reliable principles and methods,' and if the expert 'applied these principles or methods reliably to the facts of the case.'" *Johnson v. BLC Lexington SNF, LLC*, 478 F. Supp. 3d 578, 589 (E.D. Ky. 2020) (quoting Fed. R. Evid. 702). Here, Manzari list the documents and information that he relied upon to arrive at his opinion, applied his knowledge and experience, and the resulting basis for his opinions regarding the subject vehicles.

To the extent that BMW disagrees with the factual bases for Manzario's opinion, that is a matter for cross-examination at trial. *Id*. at 590 (any weaknesses in the factual basis of an expert witness' opinion bears upon the weight of the evidence rather than its admissibility) (citing *McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 801 (6th Cir. 2000)). The Court's role as a gatekeeper "is not intended to supplant the adversary system or the role of the jury: 'vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking'" Manzari's opinions to the extent that BMW finds them lacking. *Wellman v. Norfolk & W. Ry. Co.,* 98 F. Supp. 2d 919, 924 (S.D. Ohio 2000) (quoting *Daubert,* 509 U.S. at 596).

BMW's motion to exclude Manzari's opinion that plaintiffs' vehicles suffered from defective valve stem seals is denied.

**2.  Manzari's opinion that the valve stem seals in plaintiffs' vehicles were defective when sold is unsupported by the evidence**

Manzari opines that defective valve stem seals were the cause of the subject vehicles excessive oil consumption, and that the valve stem seals were defective when sold new. (*See* Doc. No. 69-3 ¶¶ 64, 73, 83, 89, 97, 105, 113.) Like its arguments above, BMW contends that Manzari is unqualified to render such an opinion and his opinion is unsupported by the evidence. But as discussed above, Manzari is qualified by his knowledge and experience to testify regarding the N63 engine. In addition to the documents and information listed above upon which Manzari relied upon to reach his opinions concerning the oil consumption issues experienced by the subject vehicles, he also examined BMW's Service and Warranty Information Booklet. (*See id.*) From this review, Manzari states that valve stem seals are not a maintenance item and BMW's service and warranty information provide "no defined interval for servicing, maintaining, or replacing valve stem seals." (*Id.*) Based upon BMW's service and warranty information and Manzari's knowledge and experience, he states that "[a] valve stem seal is a type of seal that is designed to last the life of the engine." (*Id.*) For these reasons, he opines the valve stem seals were defective at the time the vehicle was sold.[10] The Court is satisfied at this juncture that, having specifically identified the documentation upon which he applied his knowledge and experience and the reasoning supporting his opinion, Manzari's methodology is sufficiently reliable to satisfy the Court's gatekeeping function. If BMW finds Manzari's opinion lacking, it may cross examine him on that issue at trial.

BMW's motion to exclude Manzari's opinion that the valve stem seals were defective when the subject vehicles were first sold is denied.

---

[10] In his Second Report, Manzari also considered the testimony of BMW's technical service engineer Veren, who testified that N63 oil consumption issues could be resulting from "[p]rematurely aged valve stem seals." Veren testified that valve stem seals "should stay soft and they got hard" and they "should be pliable but, through age and heat, weren't as durable as maybe they were intended to be." (*See* Doc. No. 69-4 ¶¶ 7–9.)

**3. Manzari's opinion that all N63 engines suffer from defective valve stem seals is not reliable**

BMW points to paragraph 37 in Manzari's first report as the basis for this objection wherein Manzari opines: "BMW N63 engines suffer from a problem of defective valve stem seals[,]" and defective seals can cause a variety of symptoms, including excessive oil consumption. (Doc. No. 69-3 ¶ 37.) Manzari then cites various BMW documents and other sources to concluded that "the cause of excessive oil consumption in [the N63 Engines in the vehicles identified in ¶ 41 of the First Report] is and always was due to defective valve stem seals. This can be easily supported by the information listed in the Service Information Bulletin B11 08 15 which clearly lists the various symptoms that defective valve stem seals can produce." (*Id*. ¶ 42.)

Paragraph 41 recounts a 2015 study by Consumer Reports of excessive oil consumption in BMW vehicles. This report describes various BMW models with N63 engines and the frequency with which the vehicles need an additional quart of oil between oil changes. For example, the report stated that: "The V8 version of the BMW 5 Series, which contained the N63 engine in 2011, 2012, and 2013 model years, was the worst performer in the study with 43 percent of vehicles needing an additional quart of oil between oil changes as of 2015." (*Id*. ¶ 41.)

While Manzari does not specifically use the word "all" in his opinion regarding defective valve stem seals in the N63 engine, his broad statement in paragraph 37 that "BMW N63 Engines suffer from defective valve stem seals" appears to overstate both the number and nature of excessive oil consumption in the N63 engine. The Consumer Reports study he references states that 43 percent of the vehicles studied—not all—experienced excessive oil consumption. And Manzari's report acknowledges that factors other than defective seals can be the cause of excessive oil consumption, such as external oil leaks, and leaking crankcase ventilation hoses and turbos. (*Id*. ¶ 27.)

While Manzari does not appear to explicitly state in his report that all N63 engines suffer from defective valve stem seals, to the extent that Manzari opines or will seek to opine that all BMW N63 engines suffer from defective valve stem seals, BMW's motion is granted.

### 4. Manzari's opinion that plaintiffs' vehicles were not suitable for their ordinary purpose is not reliable and he is not qualified to give a "design opinion"

#### *Ordinary purpose opinion*

For the reasons set forth in a separately published and contemporaneously filed memorandum opinion and order, the Court grants BMW's motion for summary judgment on plaintiffs' second cause of action—breach of implied warranty of merchantability pursuant to the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301, and Ohio Rev. Code § 1302.27. Under Ohio law, "a seller of goods impliedly warrants that its products are of good and merchantable quality, fit and safe for the ordinary purposes for which the goods are intended." *Allen v. Andersen Windows, Inc.*, 913 F. Supp. 2d 490, 505 (S.D. Ohio 2012) (citing Ohio Rev. Code § 1302.27). Because the Court grants BMW's motion for summary judgment on plaintiffs' implied warranty claim, BMW's motion to exclude Manzari's opinion as to whether plaintiffs' vehicles were suitable for their ordinary purpose is moot and need not be addressed by the Court.

#### *Design opinion*

BMW also argues that Manzari is not qualified to render a "design" opinion that the N63 valve stem seals should have been "designed" to last a lifetime but did not. (*See* Doc. No. 69-1 at 7.) BMW expands this argument to the entire N63 engine, contending that Manzari's "opinions on the design of the N63 engine" cannot withstand *Daubert* scrutiny. (*Id.* at 9, 25 ("[Manzari] has no experience whatsoever concerning automotive design engineering.").)

Nowhere in Manzari's report does he generally opine that the N63 engine is defectively designed. He does opine that excessive oil consumption is consistent with defective valve stem

seals and that "[a] valve stem seal is a type of seal that is designed to last the life of the engine." (*See e.g.* Doc. No. 69-3 ¶¶ 64, 113.) Manzari's knowledge and experience in the automotive industry, as well as his specific experience with the "design, function, and operation" of the N63 engine qualifies him to generally opine regarding the expected life of a valve stem seal and that excessive oil consumption is a symptom of defective valve stem seals. The Court notes that BMW's own technical experts have testified that excessive oil consumption can be caused by defective valve stem seals that "prematurely aged." (Doc. No. 69-4 ¶ 7.)

It does not appear to the Court that Manzari has rendered an opinion that the design of the N63 engine is defective and, in fact, plaintiffs affirmatively disavow that the N63 engine is defectively designed (*see* Doc. No. 80 at 24). That said, there is no evidence in the record that Manzari has any experience, training, or knowledge in automotive design. Therefore, to the extent that Manzari has rendered an opinion regarding the design of the N63 engine or will attempt to do so, BMW's motion to exclude that opinion is granted.

**5. Manzari's opinion concerning the cost of repair to plaintiffs' vehicles is unreliable and irrelevant**

BMW's last objection to Manzari's report is that his opinion regarding the cost of repair of the subject vehicles is unreliable. (Doc. No. 69-1 at 26 (citing Doc. No. 69-3 ¶ 117).) In that opinion, Manzari opines that:

> where the cost of replacing valve stem seals approaches the cost of replacing the engine, as is the case with these N63 Engines, a more prudent approach is to replace the engine – a repair BMW AG itself has originally recommended. (Measure No. US 47133153-01, BMW 001557; Measure No. 47133153-05, BMW 001561). The cost to perform this repair at a BMW dealership is approximately $12,500 to $15,000.

(Doc. No. 69-3 ¶ 117.)

BMW argues that his opinion is unreliable because Manzari does not provide sufficient facts or reliable methodology for opining the engine should be replaced to repair the defect and it is "non-sensical" to claim damages in the amount of engine replacement for the five subject vehicles that have been sold or disposed of. (Doc. No. 69-1 at 26.)

First, Manzari's knowledge and experience in the automotive repair business qualifies him to opine regarding alternative automotive repair options and price ranges for those repair options. And as he points out in his opinion, BMW itself has recommended engine replacement to correct high rates of oil consumption. (*See* Doc. No. 69-6 at 12 ("If repairing the crankcase breather does not provide a solution and if no other cause for the high rate of oil consumption can be found, then, in our experience, the fault can only be rectified by fitting an exchange engine.").) In addition to his experience in knowledge regarding alternative automotive repair options and cost thereof, Manzari considered the cost of engine replacement provided by BMW dealerships to one plaintiff in this case, which was significantly higher than Manzari's opinion. (*See e.g.* Doc. No. 69-3 ¶ 111 (dealer estimate received by Webb to replace engine $23,000.) That said, Manzari's opinion regarding the cost of repairs did not separately itemize the cost of parts, labor, and other expenses to document his estimated range for repair costs.

At this juncture, however, the Court concludes that Manzari's knowledge and experience in the automotive repair industry, and citation to evidence in the record to support his opinion regarding engine replacement and the cost thereof, is a sufficiently reliable methodology to satisfy the Court's gatekeeping function. To the extent that BMW seeks to challenge the underlying factual bases for his opinion, those facts may be tested by BMW at trial. Additionally, BMW has preserved its right to argue that replacement of the engine may not be an appropriate damage

calculation for some or all of plaintiffs, depending upon the nature of any unresolved warranty issues they prove or for those who no longer own their vehicles.

BMW's motion to exclude Manzari's opinion regarding engine replacement and the cost thereof is denied at this juncture.

### Conclusion

For all of the foregoing reasons, BMW's motion to exclude the opinions of plaintiffs' expert Darren Manzari is granted in part and denied in part as stated herein. (Doc. Nos. 67, 69.) BMW's motion to exclude Manzari's testimony and opinion regarding concealment is granted. BMW's motion to exclude Manzari's opinion as to whether plaintiffs' vehicles were fit for their ordinary purpose is moot. To the extent that Manzari has opined that the N63 engine is defectively designed, BMW's motion is granted. To the extent that Manzari has opined that all N63 engines suffer from defective valve stem seals, BMW's motion is granted. BMW's motion is denied in all other respects as set forth above.

**IT IS SO ORDERED**.

Dated: January 24, 2022

_____
**HONORABLE SARA LIOI
UNITED STATES DISTRICT JUDGE**